UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO RAMIREZ URIQUIZO,<br><br>        Plaintiff,<br><br>        v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:12-cv-01908 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF SERGIO RAMIREZ URIQUIZO AND AGAINST DEFENDANT CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY |

Sergio Ramirez Uriquizo ("Plaintiff") asserts he is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Therefore, Plaintiff seeks judicial review of the decision of the administrative law judge ("ALJ") who concluded he was not disabled. For the reasons set forth below, the action is **REMANDED** for further proceedings.

**PROCEDURAL HISTORY**

Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging disability beginning September 28, 2004. (Doc. 12-6 at 8-22.) The Administration denied Plaintiff's applications initially on January 16, 2009, and upon reconsideration on June 8, 2009. (Doc. 12-3 at 28.) After requesting a hearing, Plaintiff testified before an ALJ on February 15, 2011. (*Id.* at 47.) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on May 6, 2011. (*Id.* at 28-39.) Plaintiff requested review of the ALJ's decision by the Appeals Council, which

denied the request for review on September 24, 2012. (*Id.* at 2.) Thus, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.    Relevant Medical Evidence**

In November 2004, Plaintiff underwent an MRI of his lumbar spine. (Doc. 12-13 at 16.) Dr. Eugene Roos noted Plaintiff had complained of "[l]ow back pain for 2 months," as well as numbness, weakness and pain in his left leg. (*Id.*) Dr. Roos found Plaintiff had "moderate central canal stenosis" at the L4-L5 level and "tiny disk protrusion[s]" at the L5-S1 and L3-L4 levels. (*Id.*)

On February 3, 2005, Dr. Rahimifar noted Plaintiff "complain[ed] of low back pain, with left hip pain, and . . . left shoulder pain with numbness in his left arms." (Doc. 12-13 at 18.) Dr. Rahimifar observed that Plaintiff walked with a "slight limp," and found Plaintiff had "left dorsiflexion weakness." (*Id.*)

Plaintiff underwent an MRI of his cervical spine on June 1, 2005. (Doc. 12-13 at 20.) Dr. William Dunn found Plaintiff had a "[m]oderate-sized central and left-sided protrusion at C5-6." (*Id.*)

In June 2005, Plaintiff had "decreased range of motion with decreased above shoulder reach" on the left. (Doc. 12-8 at 52.) In addition, Plaintiff had "[p]ositive straight leg raising on the left." (*Id.*) Dr. M. Rahimital recommended Plaintiff have surgery at the C5-C6 and L4-L5 levels, but noted Plaintiff did not want surgery. (*Id.*)

On July 18, 2008, Plaintiff underwent an MRI of his lumbar spine. (Doc. 12-8 at 26.) Dr. Donald Cornforth noted Plaintiff had a history of lower back pain, and had recently developed "left leg pain and numbness." (*Id.*) Dr. Cornforth found Plaintiff had "central disc protrusion" at the L3-L4 level and "central disc protrusion with moderate indentation of the caudal sac and mild left foraminal

3

stenosis" at the L4-L5 level.  (*Id.* at 27.)

Dr. Mahmoud Rashidi began to treat Plaintiff at the Bakersfield Neuroscience & Spine Institute on August 4, 2008.  (Doc. 12-8 at 45, 74.)  Dr. Rashidi noted Plaintiff had been "complaining of neck pain for four years," and the pain had worsened over the last six months.  (*Id.* at 45.)  Dr. Rashidi conducted a neurological examination, and found Plaintiff had "normal power in upper and lower extremities bilaterally" but had "decreased sensation in the left C5 dermatome."  (*Id.* at 45-46.)  He recommended Plaintiff have physical therapy and noted he "may consider surgery for the patient, if the symptoms do not improve with physical therapy."  (*Id.* at 46.)

Upon the request of Dr. Rashidi, Plaintiff had a MRI of his cervical spine taken August 14, 2008.  (Doc. 12-8 at 7.)  Dr. Cornforth reviewed the results and noted Plaintiff had a history of "[c]hronic degenerative disc disease and lower neck pain for 4 years, after a motor vehicle accident," and that Plaintiff had "radicular symptoms" in his right harm.  (*Id.*)  Dr. Cornforth determined Plaintiff had "focal disc protrusion with indentation of the anterior cord" at the C4-C5 level, and "left central disc protrusion with slight indentation of the left anterior cord" at the C5-C6 level.  (*Id.* at 7-8.)

On September 12, 2008, x-rays of Plaintiff's lumbar spine and chest were taken and reviewed by Dr. David Cheney.  (Doc. 12-8 at 19-20.)  Dr. Cheney found Plaintiff's "[l]umbar vertebral body heights and alignment [were] well-preserved."  (*Id.* at 19.)  There was "[n]o evidence of osseous injury or marked degenerative changes."  (*Id.*)  On September 15, 2008, Dr. Rashidi determined Plaintiff should have three epidural injections to treat his back pain.  (*Id.* at 39.)

Plaintiff underwent an epidural injection on October 15, 2008, performed by Dr. Jan Mensink.  (Doc. 12-8 at 37.)  Dr. Mensink noted Plaintiff "tolerated [the] procedure well" and "was discharged with no complications."  (*Id.* at 37-38.)

In November 2008, Plaintiff visited Dr. Rashidi for a follow-up regarding his neck and back pain, and reported that his back pain was "unchanged."  (Doc. 12-8 at 36.)  Dr. Rashidi noted Plaintiff "states [he] was not told the injections would be painful & the pain the back would not go away."  (*Id.*)  Dr. Rashidi indicated that Plaintiff "refuse[d] to con't [with] epidural injections" because they were "too painful."  (*Id.*)  Plaintiff informed Dr. Rashidi that he wanted to continue treatment with pain medication and "think about surgery."  (*Id.*)

On December 10, 2008, Plaintiff had x-rays of his left knee due to pain and swelling. (Doc. 12-8 at 55.) The x-rays were "normal" and did not show any fractures or joint effusion. (*Id.*)

Dr. Theodore Georgis, Jr., performed a comprehensive orthopedic evaluation on December 30, 2008. (Doc. 12-8 at 56.) Dr. Georgis reviewed the neurological consultation performed by Dr. Rashidi, as well as the MRIs of Plaintiff's lumbar and cervical spine from August 2008. (*Id.*) Plaintiff reported that he "had a constant low back pain with a deep, pins-and-needles sharpness in nature," which he described as 6/10 on average, but said could "get up to a 10/10." (*Id.* at 57.) Dr. Georgis noted:

> He states that bending forward makes it worse, lying down and pills make it better. He states that he also has numbness and tingling in the left leg. He also gets a feeling of occasional weakness in the left leg. He denies any walking imbalance or bowel and bladder control problems. He states that he can stand for up to 60 minutes at a time, after which he has increased pain. He can walk for 20 minutes at a time and he can sit for up to 1-2 hours, after which his pain increases. He states that he was declared permanent stationary in 2006 and he has not had any further evaluation or treatment since that time.

(Doc. 12-8 at 57.) Further, Plaintiff reported that his neck pain could "get up to an 8/10," and was "made worse with twisting." (*Id.*) Plaintiff told Dr. Georgis that he spent "most of the day in the house, sitting down, lying down, or reading The Bible." (*Id.* at 58.)

Upon examination, Dr. Georgis found Plaintiff had "minimal tenderness" in his neck and "moderate tenderness in the mid lumbar spine without spasm or trigger point." (*Id.* at 60.) Plaintiff' strength was "5/5 in the upper and lower extremities symmetrically with good grip strength." (*Id.*) Dr. Georgis determined Plaintiff had decreased sensation "over the left upper arm laterally, just below the shoulder, as well as . . . over the left anterior thigh." (*Id.*) Further, Plaintiff's reflexes were "2/4 in the extremities symmetrically." (*Id.*) Dr. Georgis opined Plaintiff was able to sit, stand and walk up to six hours; lift and carry "20 pounds occasionally and 10 pounds frequently;" and frequently perform "postural activities such as climbing, balancing, stopping, kneeling, crouching, and crawling." (*Id.* at 61.) Also, Dr. Georgis found Plaintiff was "limited to frequent reaching with his upper extremity due to his shoulder symptomatology," but had "no limitation to handling, fingering, and feeling." (*Id.*)

Dr. Paul Frye completed a physical residual functional capacity assessment on January 14, 2009, in which he noted Plaintiff had been diagnosed with degenerative disc disease in his cervical and lumbar spine. (Doc. 12-8 at 62.) According to Dr. Frye, Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk for a total of about six hours in an eight-

hour workday; and push, pull, handle, and feel without limitations. (*Id.* at 63-64.) In addition, Dr. Frye concluded Plaintiff was able to frequently climb ladders, ramps, stairs, ladders, ropes and scaffolds; balance; stoop; crouch and crawl;. (*Id.* at 64.) However, Plaintiff was limited to occasional kneeling and occasional lifting over head with his left arm. (*Id.*)

In February and April 2009, Plaintiff continued to report pain in his neck and back, which was treated with Viodin. (Doc. 12-8 at 108.) In May 2009, Plaintiff complained of depression and fatigue. (*Id.* at 104.) Plaintiff told Dr. Rashidi that he was "depressed due to his back pain" and because he was "unable to do much." (*Id.*) Plaintiff said that his "family used to go out a lot" but he was now "spend[ing] most of his time in his room." (*Id.*) Therefore, Dr. Rashidi diagnosed Plaintiff with "[d]epression due to his back pain," and prescribed Zoloft. (*Id.* at 105-06.)

Dr. Rashidi approved an assessment of Plaintiff's physical impairments on May 13, 2009. (Doc. 12-8 at 74-77.) Dr. Rashidi noted Plaintiff had been diagnosed with "Neck pain, Low Back pain, leg pain, Disc Herniation at C5/6, Disc Degenerative Changes, with moderate spinal & foraminal stenosis [at] L4/5." (*Id.* at 74.) He estimated Plaintiff's level of pain was "7-8," which had not been completely relieved with medication. (*Id.*) According to Dr. Rashidi, Plaintiff was able to sit three hours total and stand/walk for "0-2" hours total in an eight-hour day. (*Id.* at 75.) Dr. Rashidi opined Plaintiff had significant limitations doing reaching, handling, fingering, or lifting; and he was able to lift and carry 10 pounds occasionally and 20 pounds rarely. (*Id.*) Further, he believed Plaintiff's impairments interfered with his ability to keep his head in a constant position, such as would be required for looking at a computer screen or looking down at a desk. (*Id.*) Dr. Rashidi opined Plaintiff needed to avoid heights and was not able to stoop, kneel, bend, push, or pull. (*Id.* at 76.)

On June 8, 2009, Dr. Greg Hirokawa conducted a comprehensive psychiatric evaluation. (Doc. 12-8 at 78.) Plaintiff "reported feeling depressed, anxious, poor sleep, easily frustrated, irritable, short-term memory problems, withdrawn, fatigue, loss of interest in things and worries." (*Id.*) He said that "his depression and anxiety [were] primarily due to his physical problems, dealing with pain, having financial issues, not being able to work and do the things he used to enjoy." (*Id.*) Plaintiff told Dr. Hirokawa that he washed dishes, did yard work such as watering plants, and went to Bible study but "he doesn't enjoy anything for fun." (*Id.* at 81.) Dr. Hirokawa found Plaintiff's stream of mental

activity was "within normal limits," and "[t]hought content was appropriate." (*Id.* at 80.) Dr. Hirokawa found Plaintiff's "[i]ntellectual functioning appeared to be within the average range," and his recent and remote memory were intact. (*Id.*) Plaintiff "was able to perform a simple three-step command," but "was not able to repeat four numbers consecutively." (*Id.*) Dr. Hirokawa opined:

> The claimant's ability to remember location and work-like procedures is mildly limited. His ability to remember and understand very short and simple instructions is mildly limited. The claimant's ability to understand and remember detailed instructions is mildly limited. His ability to carry out very short and simple instructions is mildly limited.
>
> The claimant's ability to maintain attention and concentration for extended periods is mildly limited. His ability to accept instructions from a supervisor and respond appropriately to criticism is mildly limited. His social judgment and awareness of socially appropriate behavior is mildly limited.
>
> The claimant's ability to perform activities within a schedule, maintain regular attendance, and be punctual is mildly limited. His ability to function independently and sustain an ordinary routine without special supervision is mildly limited. His ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace is mildly limited.
>
> The claimant's ability to interact with coworkers is mildly limited. His ability to withstand the stress of a routine workday and deal with various changes in the work setting is mild to moderately limited.

(*Id.* at 81-82.) Dr. Hirokawa gave Plaintiff a GAF score of 60[1], explaining his "symptoms of depression and anxiety appear to be within the mild range and primarily due to his physical problems and his associated limitations." (*Id.* at 81.)

Dr. Khong completed a physical residual functional capacity assessment on June 17, 2009. (Doc. 12-8 at 83-87.) Dr. Khong noted Plaintiff had been diagnosed with degenerative disc disease and suffered from left knee pain. (*Id.* at 83.) According to Dr. Khong, Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk about six hours in an eight-hour workday; occasionally climb, stoop, kneel, crouch, and crawl; and frequently balance. (*Id.* at 84-85.) Dr. Khong opined Plaintiff had an "unlimited" ability to push, pull, handle, finger, and feel, but could not frequently reach overhead with his left arm or do "overhead work due to neck discomfort." (*Id.*)

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.*

7

On July 2, 2009, Dr. Harvey Biala completed a psychiatric review technique and mental residual functional capacity assessment. (Doc. 12-8 at 88-102.) He opined Plaintiff suffered from an adjustment disorder, with disturbance of mood. (*Id.* at 90-91.) According to Dr. Biala, Plaintiff had a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 96.) Dr. Biala believed Plaintiff was "not significantly limited" with the ability to understand, remember, and carry out very short and simple instructions, and was "moderately limited" with the ability to understand, remember, and carry out detailed instructions." (*Id.* at 99.) Further, he determined Plaintiff was "not significantly limited" in all other areas of concentration, social interaction, and adaptation. (*Id.* at 99-100.) Dr. Biala concluded Plaintiff's "[c]ognition [was] intact for simple tasks;" his concentration, persistence, and pace were "sufficient for 2 hour intervals, 8 hour day and 40 hour week;" and he was "[s]ocially available for superficial contacts." (*Id.* at 101.)

Plaintiff had epidural injections on July 28 and August 12, 2009, performed by Dr. Mensink. (Doc. 12-9 at 2.) Both times, Dr. Mensink noted Plaintiff "tolerated [the] procedure well," and he was discharged without complications. (*Id.* at 2, 5.) Plaintiff had another injection in October 2009, after which Plaintiff complained to nurses that he was weak. (*Id.* at 15.)

In November 2009, Plaintiff reported a slight decrease in his low back pain following the epidural steroid injections. (Doc. 12-13 at 12-13.) Plaintiff told Dr. Mensick that he had "no neck pain at the present time" and "[a]ll his pain [was] in his back." (*Id.* at 13.) Dr. Mensick determined a new MRI should be taken because it had been "more than six years since the last imaging." (*Id.* at 13.) Plaintiff had the MRI on his lumbar spine on March 9, 2010. (Doc. 12-13 at 10.) Dr. Kylasa found Plaintiff had "[m]ild diffuse posterior disc bulge at L4-L5 with mild central canal stenosis and bilateral neural foraminal narrowing." (*Id.*) In addition, Plaintiff had "[m]inimal posterior disc bulge" at the L5-S1 level. (*Id.* at 11.)

In May 2010, Dr. Mensick reviewed the MRI and found Plaintiff's L4-L5 disc was "non-surgical and he ha[d] some neural foraminal narrowing and short pedicles with spinal canal stenosis, worse at L4-L5. (*Id.* at 7.) Dr. Mensick noted Plaintiff had "a lot of spasm" and a "slightly antalgic" gait, but the exam was otherwise normal. (*Id.*) Plaintiff was referred to physical therapy, to occur three

times a week for six weeks. (*Id.* at 6.) In July 2010, Plaintiff reported an increase in his upper and lower back pain, which radiated down to his left leg. (*Id.* at 4.) Plaintiff told Dr. Mensink he had a break in coverage with his insurance so he had not gone to physical therapy. (*Id.*) Because Plaintiff had obtained coverage with MediCal, Dr. Mensick again referred him to physical therapy. (*Id.* at 4-5.)

In January 2011, Plaintiff reported his back problems were "getting worse" and "none of the treatments have helped." (Doc. 12-13 at 33.) Dr. Mensick noted that "there ha[d] been problems with [Plaintiff] following through with treatment protocol." (*Id.*) Dr. Mensick ordered MRI imaging "to assess the disk in his neck before [they] contemplate[d] surgery on his LS spine to see if there [was] anything different . . . that would make him more apt to be a surgical candidate." (*Id.*)

Plaintiff had the MRIs of his lumbar and cervical spines on January 17, 2011. (Doc. 12-13 at 26-27.) Dr. Shah opined Plaintiff had "superimposed small protrusions at C3-4 and C4-5 resulting in mild canal stenosis with no definite cord compression and mild to moderate bilateral foraminal stenosis at these levels." (*Id.* at 26.) Plaintiff had "mild canal stenosis but no definite canal compression" at the C5-6 level." (*Id.*) Further, Dr. Shah found Plaintiff had "[d]egenerative changes in the lower lumbar spine most marked at L4-5;" "mild canal and bilateral foraminal stenosis at L5-S1;" "mild to moderate bilateral foraminal stenosis at L3-4;" and "a small right lateral disc protrusion at L2-3." (*Id.* at 27.)

In February 2011, Dr. Mensink noted that Plaintiff complained of "back problems" and "neck pain radiating to the left arm." (Doc. 12-13 at 31.) Dr. Mensink noted that Plaintiff "may need back surgery but he has questionable cervical problems," because a C5-6 disc was "binding the cord with very little CSF signal" and he would need to have that fixed first." (*Id.*)

**B.     Administrative Hearing Testimony**

Plaintiff testified, with the assistance of an interpreter, at an administrative hearing on February 15, 2011. (Doc. 12-3 at 47.) He reported that he had not done any work for pay since September 28, 2004. (*Id.* at 51.) Plaintiff said he last worked on tractors and trucks "as a mechanic, maintenance, machinery." (*Id.* at 50.) Plaintiff said he also worked as a welder and "in field labor, pruning grapevines and the defoliation." (*Id.*)

Plaintiff reported that he did volunteer work when he "felt a little bit well." (Doc. 12-3 at 51.) He explained that he was a Jehovah's Witness and would "speak to people in the community regarding

9

what [he] learned from the Bible." (*Id.*)

He said he was no longer able to work because of "strong pains" in his neck, left arm, and lower back. (Doc. 12-3 at 51.) In addition, Plaintiff reported that he had "pain running through [his] left leg and down [his] left knee." (*Id.*) Plaintiff testified he had taken physical therapy and "tried a variety of medicines," including Vicodin, Celebrex, and injections for his pain. (*Id.*) In addition, he took medication for sleeping and depression. (*Id.* at 52.) Plaintiff reported the medication caused "[d]izziness, lack of balance, forgetfulness, and sometimes a change of character." (*Id.*) Further, he stated that he was being referred to a physician to seek about neck surgery. (*Id.* at 53.)

Plaintiff believed he was able to sit up to 45 minutes at one time and stand without pain for "about 30, 35 minutes, after [which] the pain is very strong." (Doc. 12-3 at 54-55.) He explained that he attended a Bible study twice a week where he sat for about 45 minutes, but sometimes he had to get up during the meeting. (*Id.* at 55.) Plaintiff said if he had to sit any longer than 45 minutes, the "strong pain" could cause him to go to the emergency room. (*Id.*) He testified that his wife usually drove him to the meetings, which were "about three or four blocks from [their] house." (*Id.*)

He reported that he was able to dress and bathe himself, "but not without pain." (Doc. 12-3 at 55.) Plaintiff said he was unable to bend at the waste without pain. (*Id.* at 54.) Plaintiff reported he was unable to lift anything heavy without his pain increasing "up to a ten." (*Id.*) He testified that he did "very little" housework, but would sometimes "water the yard and, on occasions (sic) . . . cut the lawn." (*Id.* at 56.) Plaintiff estimated he mowed the lawn "[m]aybe three times in the whole year." (*Id.* at 58.) Plaintiff said he had to lie down "[a]t least three or four times" in an eight-hour period, for 20 to 45 minutes at a time." (*Id.* at 58-59.)

Vocational expert Kenneth Ferra ("VE") testified after Plaintiff at the hearing. (Doc. 12-3 at 59.) The VE characterized Plaintiff's past relevant work as an equipment mechanic as "medium and skilled," work as a welder was "heavy and skilled," and the farm worker position was "medium and unskilled." (*Id.* at 60.) The VE opined Plaintiff did not have any skills that would transfer to sedentary or light work. (*Id.*)

The ALJ asked the VE to consider an individual with "the same vocational factors" as Plaintiff. (Doc. 12-3 at 60.) The ALJ stated:

> This individual can lift and carry 20 pounds occasionally and 10 pounds frequently; can sit and/or walk with normal breaks for about six hours in an eight-hour workday; [and] can push and pull without limitation frequently. This individual can frequently balance, perform all other postural activities occasionally, that is the climbing of any type, stooping, kneeling, crouching and crawling, all occasional.
>
> This individual can neither work nor reach more than occasionally overhead. I can say the overhead work would probably be bilateral, but reaching involves the left upper extremity. Otherwise, handling, fingering and feeling are unlimited. There are no visual limitations. There are no communicative limitations and no environmental limitations. There are, however, mental limitations. … This hypothetical individual has cognition intact for simple tasks. Concentration, persistence and pace is sufficient for two- hours over the course of an 8-hour day and a 40-hour week. This individual is socially available for superficial contact and this individual can adapt to workplace stressors.

(*Id.* at 60-61.) The VE opined such an individual could not perform Plaintiff's past relevant work. (*Id.* at 61.) However, the VE testified that such person could perform unskilled, light work in the national economy, such as laundry worker, packing line worker, and sorter. (*Id.* at 61-62.) The VE confirmed that each of these jobs could be performed by someone who was unable to read, write, or communicate orally in the English language. (*Id.* at 62.)

Next, the ALJ asked the VE a hypothetical question based upon the opinion of Dr. Rashidi. (Doc. 12-3 at 62.) Specifically, the ALJ stated:

> This hypothetical individual is able to sit for three hours in the course of an eight-hour workday, stand and walk for between zero and two hours. This individual cannot sit continuously in any work setting. This individual can take – can occasionally lift and carry 10 pounds, rarely carry – lift and carry 20 pounds. Unspecified significant limitations exist involving repetitive reaching, handling, fingering or lifting.
>
> This individual does not need a cane or other assistive device. This individual cannot keep his neck in a constant position, for example, looking at a computer screen or down at the desk. The next question is conclusory. This individual cannot perform any stopping, pushing, kneeling; needs to avoid heights; cannot do any pulling; cannot do any pending.

(*Id.*) The VE believed such a person would not be able to work in the national economy. (*Id.*)

**C.   The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of September 28, 2004. (Doc. 12-3 at 30.) At step two, the ALJ found Plaintiff's severe impairments included: "degenerative disc disease of the cervical and lumbar spine, and adjustment disorder." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing, including 1.04,

12.00 and 12.04. (*Id.* at 31-32.) Next, the ALJ found:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, sit, stand and/or walk 6 hours in an 8-hour workday and push and/or pull without limitation. The claimant is able to frequently balance, and occasionally stoop, kneel, crouch, crawl and climb. The claimant is unable to do frequent overhead work bilaterally, and he is unable to frequently reach above the shoulder with his upper extremity. The claimant's cognition is intact for simple tasks and his concentration, persistence and pace is sufficient for 2-hour intervals during an 8-hour day and 40-hour week. The claimant is socially available for superficial contacts, and he is able to adapt to workplace stressors.

(*Id.* at 32.) Based upon this residual functional capacity, the ALJ concluded Plaintiff was unable to perform any past relevant work. (*Id.* at 37.) However, the ALJ opined that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (*Id.* at 39.) Consequently, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.*)

**DISCUSSION AND ANALYSIS**

Plaintiff argues that he is "presumed disabled" since he turned 50 under Medical Vocational Rule 202.02, and asserts the ALJ erred in assessing the medical record and relying upon the testimony of the vocational expert to determine that he was able to perform work in existing in significant numbers in the national economy. (Doc. 15 at 10-22.) Defendant agrees that "when Plaintiff attained the age of 50, the Agency should have applied Rule 202.09. (Doc. 22 at 6.) However, Defendant argues the ALJ's decision is "supported by substantial evidence, and that prior to attaining the age of 50, the ALJ properly found Plaintiff not disabled." (*Id.*)

**A.     The ALJ's evaluation of the medical evidence**

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ determining the existence of an impairment or on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2).

A treating physician's opinion is not binding upon the ALJ, and may be rejected whether or not the opinion is contradicted by another. *Magallanes*, 881 F.2d at 751. When the opinion of a treating physician is not contradicted, an ALJ must set forth "clear and convincing" reasons to reject the opinion. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). On the other hand, an ALJ may reject the contradicted opinion of a physician with "specific and legitimate" reasons. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, because the opinion of Dr. Rashidi conflicted with the opinions of Drs. Georgis, Frye and Khong, the ALJ was required to set forth specific and legitimate reasons to give less than controlling weight to the opinions of Plaintiff's treating physician.

If there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the court when there is "more than one rational interpretation of the evidence." *Id.*; *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Plaintiff argues the ALJ erred in rejecting the opinion of Dr. Rashidi, a treating physician. (Doc. 15 at 12-17.) Explaining the weight given to Dr. Rashidi's opinion, the ALJ noted:

> I have reviewed and considered the opinion of Dr. Rashidi and accorded it very little weight, because it is inconsistent with the overall medical evidence of record. For instance, the claimant has normal muscle bulk and tone in the muscle groups without atrophy (see Exhibit 8F, p.5), and his strength was 5 out of 5 in the upper and lower extremities symmetrically with good grip and strength (see Exhibit 8F, p.5). Furthermore, recent treatment notes show that the claimant does not need surgery (Exhibit 21F, p. 4). This rationale is supported by the opinion of Dr. A. Khong, a State agency medical consultant, who reviewed the medical evidence, and who rejected Dr. Rashidi's opinion because it was secured by the claimant's disability representative, and because it is not consistent with objective clinical findings (Exhibit 11F, p.4). While I find that the source of a medical source statement is not a legitimate reason for discounting it, the fact that it is inconsistent with the medical evidence of record is a legitimate rationale, and upon the latter basis, I concur with Dr. Khong in rejecting the opinion of Dr. Rashidi.

(Doc. 12-3 at 34.) Plaintiff argues that the ALJ failed to identify specific and legitimate reasons for rejecting the opinion of Dr. Rashidi in this decision. (Doc. 15 at 12-13.) According to Plaintiff, "the record contained ample objective evidence that supported Dr. Rashidi's findings," such as a

13

neurological examination that "revealed decreased sensation," a positive straight leg raising test, and several MRIs. (*Id.* at 14.) Further, Plaintiff observes, "the record contains evidence that Dr. Rashidi's treatment team *did* recommend surgery." (*Id.* at 15, citing Doc. 12-8 at 52.)

On the other hand, Defendant argues that "the ALJ gave good reason for rejecting the opinion of Dr. Rashidi." (Doc. 22 at 7.) Defendant asserts, "Dr. Rashidi fails to explain why he opines such severe limitations when the record reflects largely normal examination findings and recommends conservative treatment." (*Id.* at 8.) In addition, Defendant observes that "a consultative examining doctor and a reviewing physician[]… both agreed that Dr. Rashidi's limitations were too severe, and opined Plaintiff had restrictions that were more consistent with the ALJ's RFC." (*Id.*)

The Ninth Circuit has determined an ALJ may reject a medical opinion when it is "unsupported by the record as a whole." *Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir. 2003); *see also Morgan*, 169 F.3d 595, 602-03 (9th Cir. 1999) (a medical opinion's inconsistency with the overall record constitutes a legitimate reason for discounting the opinion). To reject an opinion as inconsistent with the medical record, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The ALJ has a burden to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1983). Here, the ALJ failed to carry this burden.

The ALJ identified findings from the consultative examination by Dr. Georgis to support his decision to give less weight to the opinion of Dr. Rashidi.[2] However, the ALJ fails to explain how Plaintiff's strength in his arms and legs, and "normal muscle bulk and tone in the muscle groups without atrophy" conflicts with the opinion that Plaintiff is unable to sit for more than three hours in an eight-hour day. Further, the ALJ did not identify any evidence conflicting with Dr. Rashidi's opinion that Plaintiff's impairments precluded him from holding his head in a constant position, such as would be required for looking at a computer screen or looking down at a desk. (*See* Doc. 12-8 at 75.) Rather, the ALJ dismissed the entirety of Dr. Rashidi's opinion as "inconsistent with the overall medical

---

[2] Curiously, the ALJ relies upon the findings of Dr. Georgis to reject the opinions of Dr. Rashidi, but only gave the opinion of Dr. Georgis "some weight." (*See* Doc. 12-3 at 34.)

14

evidence of record" without addressing the specific limitations, which is not sufficient. The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey*, 849 F.2d at 421-22. Therefore, the ALJ erred in assessing the limitations identified by Dr. Rashidi.

**B.     Remand is appropriate in this action**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the District Court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed when no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Applying the *Smolen* factors to this case, the ALJ failed to set forth legally sufficient reasons to properly reject the limitations articulated by Plaintiff's treating physician. These limitations are intertwined the testimony of the vocational expert regarding Plaintiff's ability to perform work in the national economy, who opined an individual with all the limitations identified by Dr. Rashidi would not be able to perform work in the national economy. (*See* Doc. 12-3 at 62.) Accordingly, a remand for further proceedings on this matter is appropriate.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in assessing the opinion of Plaintiff's treating physician, Dr. Rashidi. Because the ALJ failed to apply the correct legal standards, the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Sergio Ramirez Uriquizo and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **August 1, 2014**                         **/s/ Jennifer L. Thurston**
                                                                  UNITED STATES MAGISTRATE JUDGE